The Locke Machine Company v. Commissioner.
Locke Mach. Co. v. Commissioner
Docket No. 8582.
United States Tax Court
1947 Tax Ct. Memo LEXIS 277; 6 T.C.M. (CCH) 294; T.C.M. (RIA) 47067; March 7, 1947
Peter Reed, Esq., and Walker H. Nye, Esq., for the petitioner. Howard M. Kohn, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: This case involves income, declared value excess profits and excess profits tax liability for the above named petitioner for the taxable year ended December 31, 1941, in the total amount of $26,411.41. Two questions are involved: (1) Was the compensation of two officers and two employees, as determined by the Commissioner, reasonable? (2) Was the allowance for depreciation of machinery and equipment, as determined by the Commissioner, reasonable? Findings of Fact As a part of the evidence in this case there was a stipulation of facts which is adopted in full. However, for the purpose of this decision *278 we are including only such facts from all of the evidence as are deemed essential to a determination of the issues. Petitioner is an Ohio corporation with offices and plant at Cleveland, Ohio. It filed its returns for 1941 with the collector of internal revenue for the 18th district of Ohio. It kept its books and made its returns on a calendar year accrual basis. In the deficiency notice respondent made adjustments of petitioner's claimed deductions for compensation and depreciation of machinery and equipment, with the following explanations: (a) In your return for 1941, you claimed deductions aggregating $71,996.25 for compensation of officers and two employees as follows: E. H. Baker, Jr., Vice President and
Treasurer
$29,038.84
J. E. Tomer, Secretary and Assistant
Treasurer
14,999.09
E. C. Sinclair, Superintendent
17,398.97
O. Gammel, Office Manager
10,559.35
$71,996.25
It is held that the amount of $36,500.00 in respect to the above officers and employees constitutes reasonable compensation under the provisions of section 23(a) of the Internal Revenue Code. The amount of the reasonable compensation has been determined as *279 follows: E. H. Baker, Jr., Vice President and
Treasurer
$16,000.00
J. E. Tomer, Secretary and Assistant
Treasurer
8,000.00
E. C. Sinclair, Superintendent
9,000.00
O. Gammel, Office Manager
3,500.00
$36,500.00
Therefore, excessive compensation claimed in 1941 has been disallowed in the amount of $35,496.25. (b) In item 24, page 1, of your 1941 return, you claimed a deduction for depreciation in the amount of $8,464.99 which included depreciation on machinery and equipment in the amount of $6,647.04. It is held that $2,608.32 represents a reasonable allowance for depreciation on machinery and equipment in 1941 under the provisions of section 23(1) of the Internal Revenue Code and, therefore, $4,038.72 of the deduction claimed has been disallowed. Petitioner was incorporated in 1916. It has been engaged in the manufacture of screw machine products but since about 1931 its principal product has been a bicycle coaster brake. The following is a copy of its sales record, its operating profits and per cent of dividends to capital stock: Sales
1938
1939
1940
1941
Coaster Brake & Parts
$163,008.05
$332,262.11
$211,251.82
$379,806.91
Front Hub and Parts; Other Screw
Machine Products
46,952.51
64,722.86
123,822.46
342,895.96
Total Sales
$209,960.56
$396,984.97
$335,074.28
$722,702.87
Less - Returns & Allowances
863.67
12,427.83
2,918.11
7,739.39
Net Sales
$209,096.89
$384,557.14
$332,156.17
$714,963.48
Operating Profit
$ 12,370.46
$ 60,033.55
$ 45,529.85
$176,796.31
Per Cent of Dividends to Capital Stock
6%
30%
10%
25%
*280 Payments to the four individuals in question in this determination, designated by petitioner as salary and bonus for the years 1938 to 1941, inclusive, were as follows: E. H. Baker, Jr.
1938
1939
1940
1941
Salary
$ 9,600.00
$ 9,600.00
$ 9,600.00
$15,000.00
Bonus
390.73
4,648.65
3,392.71
14,038.84
Total
$ 9,990.73
$14,248.65
$12,992.71
$29,038.84
J. E. Tomer
Salary
$ 3,600.00
$ 3,600.00
$ 3,600.00
$ 4,080.00
Bonus
312.58
3,718.91
2,714.17
10,919.09
Total
$ 3,912.58
$ 7,318.91
$ 6,314.17
$14,999.09
E. C. Sinclair
Salary
$ 4,320.00
$ 4,320.00
$ 4,320.00
$ 4,920.00
Bonus
351.66
4,183.78
3,053.44
12,478.97
Total
$ 4,671.66
$ 8,503.78
$ 7,373.44
$17,398.97
O. Gammel
Salary
$ 2,242.60
$ 2,449.62
$ 2,686.60
$ 2,760.00
Bonus
7,799.35
Total
$ 2,242.60
$ 2,449.62
$ 2,686.60
$10,559.35
Until 1941 petitioner sold its coaster brakes through a brokerage company. In 1941 Sears Roebuck Company took over the business of this brokerage company and gave petitioner an order for all the coaster brakes it could manufacture. E. H. Baker, Jr. in 1941 was vice president and general manager of petitioner. *281 He had been with the company since 1919 and conferred with the president, one H. G. Smith who owned 61 shares of stock but received no salary, on company affairs. During 1941 Baker spent the first three months in California. While Baker has been with the company it has grown steadily in prosperity. J. E. Tomer, secretary, assistant treasurer and director in 1941, was first employed in 1922 as a bookkeeper and private secretary. He later became office manager and since 1925 has devoted his efforts to products other than the coaster brake. E. C. Sinclair was plant superintendent in 1941. He is a registered mechancial engineer in Ohio and is also a director of the company. He is a graduate of The Case School of Applied Science. He has been employed by petitioner since 1928 as superintendent in charge of operations of the plant. Otto Gammel is forty-two years of age. He took a course in accounting in business organization in Ohio State University. In or about 1934 he entered petitioner's employ as an accountant at $125 per month. He succeeded Tomer as office manager, which position he held in 1941. He is a certified public accountant. The shareholdings in petitioner at the beginning *282 and end of the taxable year were as follows: 1/1/41
12/31/41
E. H. Baker, Jr.
330
350
L. B. Hastings
2
2
H. G. Smith
61
61
Ida S. Baker
252
J. E. Tomer
10
27
E. C. Sinclair
10
27
O. Gammel
10
27
Estate of I. S. Baker
232
675
726
Ida S. Baker was the mother of E. H. Baker, Jr. She died March 31, 1941, and by her will the shares she owned were given to E. H. Baker, Jr. In 1927 petitioner corporation adopted a plan of compensating certain of its executive employees by the payment of a bonus at the end of the year in addition to their regular salary. The amount of this bonus was determined by first setting aside an amount equal to ten per cent of the capital stock of the petitioner and then dividing approximately thirty per cent of the remaining profits in bonus payments. The last formal resolution by the board of directors prior to April 1941 was passed in February 1931, but the bonuses were regularly paid in the interval. Prior to 1941 the bonus allocation had been as follows: J. E. Tomer
8 per cent
E. C. Sinclair
9 per cent
E. H. Baker, Jr.
10 per cent
Total
27 per cent
Prior to the meeting of 1941 Otto Gammel *283 complained about the meagerness of his salary and threatened to leave petitioner's employ unless some provision were made for him in the bonus payments. Thereupon Tomer, Sinclair and Baker each agreed to contribute one per cent from their bonus to Gammel and the board of directors raised the total bonus fund from 27 per cent to 29 per cent and agreed to pay Gammel an additional two per cent. In the resolution passed April 14, 1941, the bonus percentage approved by the directors was as follows: E. H. Baker, Jr.
9 per cent
E. C. Sinclair
8 per cent
J. E. Tomer
7 per cent
Otto Gammel
5 per cent
At the same meeting the directors increased the basic salaries of said employees as follows: E. H. Baker, Jr.
$5,400.00
J. E. Tomer
480.00
E. B. Sinclair
600.00
O. Gammel
73.40
Prior to 1935, (the record does not show for how many years) petitioner had taken a depreciation rate of twelve per cent on its machinery and equipment. This was to cover depreciation, repairs and obsolescence. In 1936 the Commissioner insisted that the reserve for depreciation was too great and petitioner consented to an adjustment in this reserve to the extent of a reduction *284 of $9,649.29. It was also agreed at that time that the rate of depreciation should be reduced to seven per cent and that rate was continued through the year 1940. The reserve for depreciation maintained a very constant level in the neighborhood of 78 per cent through the year 1939. However, in 1940 and 1941 unusually large dispositions occurred and the percentage of reserve for depreciation decreased to 66.4 in 1941. During all of this period, furthermore, the average age of the equipment remained constant at approximately 13 years. In 1941 petitioner calculated its depreciation by taking seven per cent of the cost of all machinery excepting that which had been fully depreciated and that which the full seven per cent would over-depreciate. For that machinery also purchased during the year 1941 a rate of 3 1/2 per cent was used. Owing to the fact that during 1941 two shifts of employees operated the plant and that new and unskilled employees were engaged to operate the machines, petitioner then increased its rate of depreciation by 3 1/2 per cent of the undepreciated gross cost which allowed a depreciation rate for 1941 of 10 1/2 per cent. The amounts realized from the disposal *285 of machinery and equipment were as follows: 1938
$ 2,965.00
1939
1,186.00
1940
4,085.00
1941
8,276.37
Total
$16,512.37
The consumption of electric power by petitioner in kilowatt hours for 1940 and 1941 was as follows: Jan.
Feb.
Mar.
April
May
June
July
Aug.
Sept.
Oct.
Nov.
Dec.
1940
11160
7680
8520
10380
12720
10740
15420
16380
18900
31680
22380
25440
1941
30180
27240
26400
21080
24240
26340
31500
28500
29160
35460
30840
30780
Opinion The first question before the Court in this case is to determine whether or not the compensation paid to petitioner's executive officers during the year 1941 was ordinary, necessary and reasonable in amount. The courts generally have been very much inclined to sustain compensation paid to corporate officers when that compensation is the result of a long established corporate policy to pay a basic salary and supplement the same by a contingent bonus based upon the extent of the profits made by the corporation in any one taxable year, even though the amount of such bonus and basic salary might be larger than would ordinarily be considered *286 reasonable if paid by the corporation as a salary without having reference to the amount of profits made in a taxable year. The petitioner in this case has cited and quoted from some of these cases in which such salaries and bonuses have been approved as deductions for tax purposes from corporate income. However, there is lacking one outstanding characteristic in all of these cases cited by petitioner which is present in the case at bar. In none of the cited cases have the profits of the corporation been abnormally increased by war conditions. In the case at bar, in 1939 the general screw machine products sold by petitioner approximated $65,000. In 1941 the approximated $343,000. The operating profit in 1939 approximated $60,000; in 1941, $177,000. It is a matter of general knowledge that the year 1939 was a year of generally healthy peacetime business in the United States. Business was slightly, although not extensively, stimulated by war orders from abroad. However, for all general purposes it was a normally prosperous business year. In 1940 the war orders from abroad increased materially and by 1941 we had not only become the "arsenal of democracy" but were actually engaged in *287 the war ourselves. It should certainly be apparent that there is a vast difference between unusual profits which may sporadically befall a particular corporation as the result of some exceptionally fortunate venture and those enormous profits which fall to industry generally during such an industrial upheaval as is involved in a world-wide military conflict. The nation is then expending billions in a struggle for self preservation and at the same time is attempting to protect its economic stability by imposing severe taxes on the abnormal profits resulting to industry from its own extravagant expenditures. Conditions at such a time can certainly not be described as ordinary. Petitioner, to sustain its contention that this Court should not look too closely at the reasonableness of the compensation involved in this proceeding because that compensation was the result of a long established policy of the taxpayer, cites Wm. S. Gray & Co. v. United States, 35 Fed. (2d) 968. In that case the years 1916, 1917 and 1918 were involved and the corporation was engaged in the business of importing and exporting chemicals and it is evident from the decision that the war conditions *288 existing at that time were actually injurious to the taxpayer. The Court says: The volume of business was greatly developed from year to year until it reached a peak in 1916. Thereafter its earnings grew less, and as the earnings increased their [the executive officers] compensation increased, and as the earnings decreased their compensation decreased. Falling off of the earnings was due to the peculiar conditions of the period. In that case, furthermore, the Court held that the increased earnings of the taxpayer had been shown to be due to the personal activities of the employees whose compensation was in question. On this the Court says: * * * If the profits were small, the sum realized from the percentage was small, and if the profits were large, the sum so realized was larger, depending in each year upon the loyalty, vigilance, and intelligent effort, and the stimulated ambition of each of the parties. In the case at bar there is no question but that the above quotation would be equally applicable up to and including the year 1939 but for the year 1941 there is no evidence of any increased activity on the part of two of the employees involved. In fact, E. H. Baker, Jr. *289 , the one receiving the highest increase in compensation, spent three months of that year in California. There was some increase in the responsibilities and labor of Sinclair and Gammel but this was far out of proportion to the increase in profits. Petitioner cites Heywood Boot & Shoe Company v. Commissioner, 76 Fed. (2d) 586. This case involves the peacetime year or 1926 and a corporation which had for many years before that taxable year and for two years after that taxable year relied on a system of basic salary plus a bonus. The corporation throughout its existence had been exceptionally prosperous and had paid an average stock dividend of thirty per cent. During 1926 it was impossible to pay this dividend from the profits of that year and the Commissioner refused to approve the bonus. The Court held that such disapproval was not warranted as under all the circumstances in that case the bonus and salary together constituted reasonable compensation. Austin v. United States, 28 Fed. (2d) 677, cited by petitioner, has practically no application to the case at bar on the facts. The years involved were 1920 and 1921 and an insolvent corporation wholly unable *290 to finance its business of a coal broker entered into a contract with its three officers whereby the officers waived all salary, agreed to finance the coal business and to accept their entire compensation by dividing the profits between them. In this way they obtained the protection of the corporate form and the economic advantage of a partnership. We are not now considering legal reasoning of the Court of Appeals in that case, which reversed the District Court, but the facts of the case are so far removed from those in the one at bar that the case has no applicability. The case of Thomas N. Perkins, 33 B.T.A. 606, involved the year 1927 and the question of the deductibility of a chief executive's salary and bonus. The salary was $15,000 and the bonus was ten per cent of the profits. This bonus contract between the employee and the corporation had been in existence for many years. It happened that in the taxable year the corporation realized exceptionally large long-term capital gains from the sale of stock which it had received as dividends. The court properly held that the mere fact that the profits in this one year were abnormally large would not make a contingent *291 compensation based upon those profits unreasonable. The distinction between the abnormality in the Perkins case and the abnormality involved in the case at bar is that in the Perkins case the taxpayer was the only one experiencing that particular abnormality. The profits were not due to lavish expenditures by the Government which affected all industry and which could not have been in contemplation of a corporation like the taxpayer herein who in 1931 adopted the policy of compensation by a fixed salary and bonus. Draper & Co., 5 T.C. 822, approaches more nearly to the case at bar than any of the cases relied upon by the taxpayer. It involved the year 1941 and a taxpayer who was engaged in the buying and selling of unprocessed wool. During the taxable year the gross sales amounted to $17,400,000. The bonus plan had been in operation for two years and the bonus compensations were very substantial sums. However, there was no evidence in that case that the sales or profits of the corporation were influenced by the war as the sales had exceeded $17,000,000 in six prior years and in one of those years they had exceeded $17,400,000. This situation does not compare well with *292 that of the taxpayer herein, which experienced a trebling of its operating profit and a five-fold increase in the amount of its general screw machine product sales, over the prosperous peacetime year of 1939, in the war year 1941. There was no convincing evidence in the case at bar that there was a material increase in the labor or administrative cares of more than two of the corporate officers between 1939 and 1941. Petitioner, furthermore, failed to justify the salaries paid by any testimony whatsoever of the compensation paid by corporations operating similar businesses. The increased compensation is based almost wholly upon the increased profits made by the taxpayer. Just how much of those profits were due to increased volume and how much was due to increased prices is not clear from the record. From the record of consumption of electric power it is evident that the excess work time which the taxpayer devoted to its business in 1941 began in October of 1940. It was therefore evident to the taxpayer by January 1941 that an unusually prosperous year was in prospect. In fact, it is a matter of general knowledge that during the latter half of 1940 and all of 1941 every manufacturing *293 concern owning a turret lathe or screw machine could obtain full employment for all of his machines at very liberal prices. By April of 1941, when petitioner's directors had voted the increased salaries and the changed bonuses, petitioner had a contract for all of the bicycle coaster brakes it could manufacture and, since it was already operating two shifts of laborers, it certainly had large and unusual profits in anticipation at said time. The condition of this taxpayer was very similar to that of practically all other concerns engaged in similar businesses in the United States and if this taxpayer can deduct inflated salaries which are based upon abnormal war profits because such compensation resulted from a long established policy of the taxpayer corporation, then the requirement that all salaries must be ordinary, necessary and reasonable has not been observed and the Government, at a time when it needs tax income most vitally, will be unjustly deprived of such income. In Lincoln Electric Company, 6 T.C. 37, this Court commented upon the tax needs of the country in time of war in the following words: * * * the high rates of these taxes were deliberately fixed *294 by Congress for the purpose of increasing the public revenue to meet rapidly growing Government expenditures for military purposes by taking a great part of such abnormally high profits resulting directly or indirectly from those Government expenditures. It is therefore our finding in this case that the petitioner has not established that the compensation paid by it to E. H. Baker, Jr., J. E. Tomer, E. C. Sinclair and O. Gammel in the tax year 1941 in the total amount of $71,966.25 was reasonable compensation for services rendered and that there is no evidence in the record to overcome the presumption of correctness of the finding of the Commissioner as to a reasonable allowance for salaries for Baker and Tomer at $16,000 and $8,000, respectively. However, the evidence does show that during the year 1941 this factory operated with an increased payroll and at two labor shifts instead of the one shift formerly used. There is no evidence that this new operation increased the duties of Baker, who was at the factory but nine months of that year, or of Tomer, who was in charge of sales. But as to Sinclair, who is a graduate of The Case School of Applied Science and who was plant superintendent, *295 as well as a registered mechanical engineer in Ohio, there is no question but that his responsibilities were somewhat increased in 1941. As to Otto Gammel, furthermore, who was office manager and who had direct charge of all of the bookkeeping involved in the increased payroll and increased purchases and sales and who was also a certified public accountant, it is obvious that his duties would be greatly increased during that year. It also impresses us that his salary prior to 1941 was extremely low for a man of his background. This fact seems to have been impressed upon the other officers of the company because when Gammel said he would no longer work for such compensation they agreed to an increase in 1941 which made his compensation $10,559.35. We therefore feel impelled from all of the evidence in this case to increase the salary deduction allowance determined by the Commissioner in the amount of $1,000 for Sinclair and $4,000 for Gammel. This makes the salary deductions which we find to be reasonable as follows: E. H. Baker, Jr.
$16,000.00
J. E. Tomer
8,000.00
E. C. Sinclair
10,000.00
O. Gammel
7,500.00
Total
$41,500.00
The Commissioner contends that *296 the average useful life of the taxpayer's machinery and equipment is twenty years and that a depreciation rate of five per cent is all that is warranted. Petitioner contends for a depreciation rate of 10 1/2 per cent. There have been introduced in this case involved calculations, graphs and records by the petitioner to justify the 10 1/2 per cent depreciation rate which it claimed for the year 1941. A machinery salesman for a large machine and tool supply company inspected petitioner's shop in 1946, when the testimony shows that the shop was running under the same conditions as those existing in 1941. His testimony was that when machines were being operated by unskilled workers, as was the condition existing in 1941, with the prolonged hours of operation then in existence and the comparatively difficult production problems which confronted petitioner in machining the coaster brakes and other screw machine products which it was producing in 1941, the average length of life of the tools used under those conditions was ten years. Sinclair, the factory superintendent, testified to the same effect. The experience of petitioner shows that a depreciation rate of twelve per cent created *297 too large a reserve for depreciation and the rate was voluntarily reduced in 1936 to seven per cent, which was retained through the year 1940. Under this rate the ratio of depreciation reserve to undepreciated gross cost remained at an almost constant figure until 1940, when an unusually large recovery from the disposition of equipment was realized. During all of this time, furthermore, the average age of the machinery in use remained at a substantial constant of thirteen years. It is therefore our conclusion from the evidence in this case that for normal wear, tear and obsolescence a depreciation rate of seven per cent would be as close an approximation of petitioner's depreciation requirements as could be estimated. In 1941, however, the hours of plant operation, the total man hours and the kilowatt hours of electrical consumption were approximately twice those of 1940 and the number of employees was increased from sixty-three in 1940 to 106 in 1941. The testimony discloses that many of these new employees were unskilled and had to be trained in the operation of the machines. The expenditure for repairs increased from $518 in 1940 to $6,339 in 1941, although this is partly accounted *298 for by the fact that the purchase of new machinery cost $14,700 in 1940 and only $3,300 in 1941. Nevertheless, we accept petitioner's argument that there was a greater rate of depreciation under conditions existing in 1941 than in previous years. We will also accept the testimony of petitioner's expert that under these conditions the average useful life of the machines would be ten years. However, as the useful life of the machines would be reduced from fourteen years to ten years, it is obvious that the obsolescence factor in the depreciation allowance would be materially decreased, for the reason that the shorter the useful life of the machine the less would be the opportunity for new and improved models and the occurrence of obsolescence. Furthermore, the testimony in this case shows that petitioner, from 1938 to 1941, had realized $16,512.37 from the disposal of used machinery and equipment. Therefore, taking all available facts into consideration, it is our conclusion that a ten per cent rate of depreciation is somewhat too high even though the useful average life of the machinery is accepted as being one of ten years. It is our finding, therefore, that the petitioner has *299 introduced sufficient testimony in this case to overcome the presumption of correctness of the Commissioner's finding on the question of depreciation and that from all of the testimony the allowable rate of depreciation to petitioner for the year 1941 is nine per cent of the undepreciated gross value of its machines and equipment. Decision will be entered under Rule 50.